**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DONALD L. SMALL and SMALL &** | **:** | **CIVIL ACTION NO. 3:02-CV-1089** |
| **SMALL, INC.,** | **:** | |
| | **:** | **(Judge Conner)** |
| **Plaintiffs** | **:** | |
| | **:** | |
| **v.** | **:** | |
| | **:** | |
| **CORE EMPLOYER SERVICES, INC.** | **:** | |
| **and CNA UNISOURCE,** | **:** | |
| | **:** | |
| **Defendants** | **:** | |

## <u>MEMORANDUM</u>

Presently before the court for judgment are the breach of contract and detrimental reliance claims of plaintiffs, Donald L. Small and Small & Small, Inc. (collectively "Small").  Small, a Pennsylvania-licensed insurance agent, contends that defendants, Core Employer Services, Inc. ("Core"), and CNA Unisource ("CNA"), breached a contract to provide services to Small's clients, and that Small detrimentally relied on defendants' promises to provide these services.  Small seeks to recover over $450,000 in damages purportedly attributable to defendants' actions.

During a one-day bench trial, the parties presented documentation and testimony relating to their business dealings, to the alleged contract, and to the appropriate method of calculating damages.  The action is now ripe for judgment under Federal Rule of Civil Procedure 52.  Based on the findings that follow, the court concludes that Core is liable to Small for breach of contract and detrimental reliance, but that CNA is not liable to Small on either of the claims.

I.    **Findings of Facts**

1.      Donald L. Small is a licensed insurance agent and the principal owner of Small & Small, Inc., a property and casualty insurance agency located in Stroudsburg, Pennsylvania.  (Doc. 84 at 6, 39-40).

2.      In 1998, Small, as an authorized agent for CNA, began offering to his customers, through CNA, professional employer organization ("PEO") services, including workers' compensation, human resource administration, health insurance products, 401-K plans, and payroll services.  (Doc. 84 at 7, 42-43, 48; Trial Ex. 4).

3.      Between 1998 and 2002 Small placed approximately twelve business clients representing over 400 employees with CNA's PEO services, and received as compensation a percentage of the administrative fee charged by CNA to these clients.  (Doc. 84 at 8, 43-44).

4.      Small received passive income for placing his PEO clients with CNA in the amount of approximately $50,000 per year.  (Doc. 84 at 8, 37-38).

5.      Small also received peripheral business from his PEO clients via the sale of additional insurance policies to his clients' employees.  (Doc. 84 at 84-85).

6.      In January 2002, Small received a telephone call from a CNA employee who stated that CNA would be discontinuing its PEO services.  (Doc. 84 at 10).

7.      Shortly thereafter Small received a letter from CNA dated January 31, 2002, stating that CNA would be exiting the PEO business effective March 31, 2002. (Doc. 84 at 10-11; Trial Ex. 1).

8.     The letter from CNA also provided, in relevant part, that:

> We are also exploring alternative arrangements in an attempt to minimize any inconvenience to current PEO clients, and will be providing further information on our progress in the coming days.  In the meantime you will need to work with your clients to secure replacement employee benefits and workers' compensation insurance coverage by March 31, 2002.

(Trial Ex. 1).

9.     Small's clients also received a letter from CNA, dated February 1, 2002, notifying them of CNA's exit from the PEO business and advising them that they should secure replacement employee benefit and workers' compensation insurance coverage by March 31, 2002.  (Doc. 84 at 11-12; Trial Ex. 2).

10.     Shortly after receiving the CNA letter, Small contacted Ed Costello ("Costello") of H.R. Logic regarding the possible placement of Small's PEO clients with H.R. Logic.  (Doc. 84 at 13-14, 15).

11.     H.R. Logic was a national PEO service company similar to CNA; it had fifteen years of PEO experience and was backed by several large investors. (Doc. 84 at 198).

12.     Costello was familiar with Small's PEO clients because he had worked for CNA and he had helped Small place those clients with CNA.  (Doc. 84 at 13-14, 197, 200).

13.     Small provided to Costello all information necessary for a review of the PEO accounts, and received from Costello price estimates for H.R. Logic

replacement PEO services, including underwriter-approved workers' compensation services.  (Doc. 84 at 14-15, 84, 200-06).

16.   Under the proposed agreement with H.R. Logic, Small's compensation was similar to that which he received from CNA.  (Doc. 84 at 207).

15.   Small provided to his clients several alternatives to CNA's PEO services, including buying individual policies and services, buying non-PEO services from CNA and supplementing them with services from elsewhere, or transferring the accounts to H.R. Logic.  (Doc. 84 at 15).

16.   All of Small's clients opted to transfer to H.R. Logic services, and Small and Costello prepared paperwork to transition Small's PEO accounts to H.R. Logic.  (Doc. 84 at 49, 50, 56, 84).

17.   On February 14, 2002, the presidents of CNA and Core established a conference call with Small and other CNA agents around the country to discuss the possible transfer of PEO services from CNA to Core.  (Doc. 84 at 16-18, 63, 78, 170).

18.   During the conference call, Core presented itself as a "simplified solution" to the problem of CNA exiting the PEO business; the transition to Core was represented as "seamless" due to an understanding between CNA and Core that protected the pricing established under preexisting CNA-PEO contracts, and allowed Core to service the clients with a full panoply of PEO services, with the exception of payroll services which CNA would continue to provide.  (Doc. 84 at 18, 171-72).

19.     During the conference call, Ed Rawles ("Rawles"), President of Core, stated that he would meet with any CNA agents and their clients who wanted to learn more about the Core option.  (Doc. 84 at 22, 93-94, 169, 172-173).

20.     Small and a few other agents expressed to CNA's Vice President of Sales, Bill Leahy ("Leahy"), a desire to meet with Rawles regarding the Core option.  (Doc. 84 at 22, 93-94, 169, 172-73).

21.     The "seamless transition" offered by Core presented the best alternative service to Small because:  (i) enrollment in a new PEO plan normally causes disruptions for the client, including on-site visits to the client's place of business and discussions with each of the client's employee's; (ii) the agreement between CNA and Core would allow Small's clients to receive the same pricing and coverage; and (iii) the paperwork necessary for a transition would be minimal and the files were already set-up at Core for the transfer.  (Doc. 84 at 18, 68, 201).

22.     There was no substantive difference between CNA's PEO services and those being offered by Core.  (Doc. 84 at 18-19).

23.     Around the time of the conference call, Small received a letter from Core dated February 14, 2002, indicating that Core and CNA had entered into an agreement for Core to serve as the "alternative" to CNA's PEO services.  (Doc. 84 at 16, 47; Trial Ex. 3).

24.     The letter states that Core is "able to offer a relatively seamless transition from CNA[] and [to] protect [Small's] revenue stream."  (Trial Ex. 3).

5

25.     The letter states that Core will continue to provide the same CNA payroll processing and billing services utilizing the same CNA technicians and at the same CNA rates, and that "basically, all current terms and conditions" that Small and his clients had with CNA would "remain as is."  (Trial Ex. 3).

26.     The letter states that Core's workers' compensation carrier was "A" rated, and that it had "agreed to accept the vast majority of accounts 'as is'."  (Trial Ex. 3; Doc. 84 at 29).

27.     The letter states that Core is negotiating with an insurance company to provide health coverage, and assures that, even if those negotiations fail, "[t]here will be no break in coverage and client employees will have a variety of plans and provider networks to select from."  (Trial Ex. 3).

28.     The letter states that Small's commission structure will remain the same, and that he will be paid twenty-five dollars for each employee who converts to Core and remains through July 1, 2002.  (Trial Ex. 3; Doc. 84 at 19).

29.     The letter requests that Small have his clients sign an enclosed subscriber agreement "stating that [the client] understand[s] the change from CNA[] and that the terms and conditions will remain the same except for benefit providers."  (Trial Ex. 3).

30.     Core sent a substantially similar letter directly to Small's PEO clients. (Trial Ex. 5; Doc. 84 at 20-21, 52).

31.     On or around February 15, 2002, Small began contacting his clients to recommend Core as the alternative PEO provider.  (Doc. 84 at 20).

32.     Small told clients that a transition from CNA to Core would require very little disruption and that they would receive the same pricing and payroll from Core as they had from CNA.  (Doc. 84 at 20).

33.     All of Small's clients agreed to transition their PEO services to Core. (Doc. 84 at 20).

34.     On February 21, 2002, Rawles convened a meeting at CNA offices in Philadelphia, open to any CNA agents and their clients, to answer any questions about the transfer of PEO accounts to Core.  (Doc. 84 at 21, 63-64, 88, 95, 172).

35.     Small and Ray Kohl ("Kohl"), the president of one of Small's largest clients, Apex Fire Protection ("Apex"), were the only individuals who attended the meeting.  (Doc. 84 at 21-22, 209-11).

36.     Leahy facilitated the introductions, but he did not participate substantively in the meeting and, in fact, was not present during the majority of it. (Doc. 84 at 22, 93-94, 169, 172-73).

37.     During the meeting Kohl relayed that he was very concerned about workers compensation insurance; if Apex's workers compensation policies lapsed on March 31, 2002, his employees would have to abandon all active job sites.  (Doc. 84 at 211).

38.     Rawls did not ask for any additional information from Small or Kohl, but stated that he had reviewed the files of Small's PEO clients and could transition them to Core in a relatively "seamless" manner with a minimal amount of paperwork.  (Doc. 84 at 22-23, 88-89, 211).

39.     No one from CNA offered any monetary or other tangible consideration to Small for transitioning to Core; the guidance offered by CNA was merely a recommendation.  (Doc. 84 at 67, 70).

40.     Although Small did not sign a contract with Core, both he and Kohl left the meeting believing that the transfer from CNA to Core was a "done deal" and that Core was taking over Small's PEO accounts.  (Doc. 84 at 46, 53, 173-74, 212-13).

41.     Leahy believed that the meeting between Rawles, Small, and Kohl "successful."  (Doc. 84 at 46, 53, 173-74, 212-13).

42.     Following the meeting, Small assisted his PEO clients in filling out the required paperwork and, during the first week of March, submitted to Core the paperwork for all but one of his clients.  (Doc. 84 at 23-24).

43.     Small sent the remaining client's paperwork to Core via express mail on or about March 23, 2002.  (Doc. 84 at 22-23).

44.     On March 22, 2002, Small contacted Core to inquire about certificates of insurance for Apex, to ensure that Apex employees could continue their work on various construction jobs; Small was assured that the certificates would be processed expeditiously.  (Doc. 84 at 24-25).

45.     Shortly thereafter, a Core representative contacted Small and requested additional loss information for Apex's workers' compensation, ostensibly so that Core could process the certificates.  (Doc. 84 at 25-26, 79).

8

46.     Although certain loss information for Apex had been already provided to Core through CNA, Core requested Apex's loss experience for several prior years; Small immediately provided the requested loss information to Core. (Doc. 84 at 26-27).

47.     Facing a March 31, 2002, cancellation date, Small was quite concerned about the last minute nature of Core's request.  (Doc. 84 at 80-81).

48.     On or about March 24, 2002, Small telephoned Rawles and reiterated Apex's urgent need for its insurance certificates.  (Doc. 84 at 27-28).

49.     Rawles told Small that Core was having difficulty with the workers' compensation carrier, but assured Small that the matter would be resolved and that Apex would have its certificates.  (Doc. 84 at 28).

50.     Small did not hear from Rawles the following day and once again telephoned him; Rawles informed Small that he was traveling to New York to discuss Small's PEO accounts with the workers' compensation carrier.  (Doc. 84 at 28, 82-83).

51.     On March 26, 2002, Rawles telephoned Small and stated that Core was unable to resolve the issues with the workers' compensation carrier, and that the company would not underwrite any PEO businesses in New York, New Jersey, or Pennsylvania.  (Doc. 84 at 28, 71-72).

52.     All of Small's PEO accounts were in New York, New Jersey, and Pennsylvania.  (Doc. 84 at 28-29).

53.     Small immediately contacted his clients and relayed that Core would not be able to provide the coverage.  (Doc. 84 at 30-31).

54.     As a result of Core's inability to provide coverage, Small's clients were forced to place their workers' compensation with a new carrier, secure payroll and human resources services, and obtain new group health insurance.  (Doc. 84 at 73).

55.     Although Small was able to assist some of his clients with replacement services before the March 31 deadline—including the procurement of workers' compensation for approximately five of his clients, for which he received a commission—Small lost all PEO business.  (Doc. 84 at 30-31, 74).

56.     Small's monetary losses associated with the loss of PEO business included:  prospective commissions from PEO clients, prospective conversion income offered by Core for clients' employees transferring to Core, and prospective sales of non-PEO products and services to PEO clients.  (Doc. 84 at 106).

57.     Small's loss of prospective commissions from PEO clients is appropriately calculated using a twelve-month run rate of Small's commissions from CNA.  (Doc. 84 at 120, 124, 145).

58.     Small's loss of PEO commissions must be calculated based upon a percentage of CNA's PEO administration fee.  CNA's administration fee was based upon employee salaries.  (Doc. 84 at 120).

59.     To calculate properly the loss of PEO commissions:  (i) salaries must be averaged for the entire year, and (ii) the wages of each company must be increased annually based upon verified client-employer salaries or, if unavailable,

upon the reasonable assumption of a three percent annual salary increase.  (Doc. 84 at 120, 131, 155-58).

60.     Small's loss of PEO commissions calculation does not assume any additional clients, does not provide a set-off for overlapping workers' compensation commissions, and does not provide for any increase in Small's commissions.  (Doc. 84 at 109, 111-12, 121, 158-59).

61.     No variable costs were factored into the damages for the loss of PEO clients because, historically, Small's costs were negligible.  (Doc. 84 at 112).

62.     Small's expert witness, James Gatusso, Jr., testified that, under generally accepted accounting principles, the standard period for a commercial loss of earnings analysis is three years.  He also testified that a seven-year period for the assessment of lost earnings is the general "rule of thumb" in the insurance industry; however, the court finds this testimony to be highly speculative and unsupported by the evidence of record.  (Doc. 84 at 116-17, 128).

63.     Based upon reasonable accounting methods and generally accepted accounting practices, three years is a proper and reasonable period of time for the assessment of Small's lost earnings.  (Doc. 84 at 113-16, 166-67).

64.     Small proffers a total of $401,954 in lost PEO commissions, but this sum represents commissions over a six-year period, rather than a three-year period, and it does not take into account annual commissions that Small receives related to the placement of workers' compensation services for his former PEO

11

clients totaling approximately $10,000.  (Doc. 84 at 87, 92, 110-11, 118-19, 128-30; Trial Ex. 7).

65.     A reasonable and appropriate amount of damages for lost PEO commissions is $146,418.00, representing three years of losses with a set-off for overlapping workers' compensation commissions.  (See Trial Ex. 7; Doc. 84 at 87, 92, 110-11).

66.     Loss of prospective conversion income is properly calculated based upon 442 employees working for Small's PEO clients, and Core's promise to pay twenty-five dollars for each employee that a CNA agent transitioned to Core; this calculation results in a net amount of $11,050 attributable to loss of conversion income.  (Doc. 84 at 121-22, 146; Trial Ex. 7).

67.     Loss of prospective sales of non-PEO commissions is calculated based upon Small's historical rate of success in selling non-PEO products and services to existing clients.  (Doc. 84 at 123).

68.     Small's PEO business provided a "captive audience" to whom he could market non-PEO products and services.  (Doc. 84 at 122, 134).

69.     Although Small proffered a net loss of $63,231 for commissions related to sales of non-PEO products and services to the captive audience, this figure is based upon an unreasonable six-year period of time.  (Doc. 84 at 124, Trial Ex. 7).

70.     Small's proffered loss of commissions on non-PEO products and services does not address an appropriate set off for those products and services

sold to former PEO clients who remained with Small as captive audiences in non-PEO related areas.  (See Doc. 84 at 161-62).

71.     Small's proffered loss amount represents hypothetical commissions that are based upon hypothetical sales, and is too speculative upon which to award damages.

72.     Small did not adduce sufficient and concrete evidence upon which the court could calculate loss of commissions on non-PEO products and services.

## II.     Discussion

### A.     Breach of Contract

Under Pennsylvania law,[1] a party asserting a breach of contract claim must demonstrate (1) the existence of a contract and its essential terms, (2) a breach of a duty imposed by that contract, and (3) damages arising from the breach. Corestates Bank, N.A. v. Cutillo, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999).

A contract may be oral, written, or inferred from the acts and conduct of the parties.  Sullivan v. Chartwell Inv. Partners, LP, 873 A.2d 710, 716 (Pa. Super. Ct. 2005).  A valid agreement may be found where the parties reach a mutual understanding on a matter, sufficiently delineate the terms of their bargain, and exchange consideration.  RegScan, Inc. v. Con-Way Transp. Serv., Inc., 875 A.2d

---

[1] Jurisdiction over the claim is based on diversity of citizenship, see 28 U.S.C. § 1332, and none of the parties dispute the applicability of Pennsylvania law, see Erie R.R. Co. v. Tompkins, 304 U.S. 64, 79-80 (1938); see also Borse v. Piece Goods Shop, Inc., 963 F.2d 611, 613 (3d Cir. 1992) (noting that federal courts sitting in diversity must apply the substantive law of the state of the forum state).

332, 336 (Pa. Super. Ct. 2005); <u>Weavertown Transp. Leasing, Inc. v. Moran</u>, 834 A.2d

1169, 1172 (Pa. Super. Ct. 2003); <u>Greene v. Oliver Realty, Inc.</u>, 526 A.2d 1192, 1194 (Pa.

Super. Ct. 1987).  Consideration exists when there is a bargained-for exchange:  the

conferring of a benefit upon the promisor or causing a detriment upon the

promisee.  <u>Weavertown</u>, 834 A.2d at 1172; <u>Cobaugh v. Klick-Lewis, Inc.</u>, 561 A.2d

1248, 1250 (Pa. Super. Ct. 1989); <u>Cardamone v. Univ. of Pittsburgh</u>, 384 A.2d 1228,

1232 (Pa. Super. Ct. 1978).

In the matter *sub judice*, it is clear that a contract for continued PEO services

did not exist between CNA and Small.  Indeed, CNA correspondence advised Small

that the company was "exit[ing] the [PEO] business" and that Small would "need

to work . . . to secure replacement employee benefit and workers' compensation

insurance" for his clients before April 1, 2002.[2]  (Trial Exs. 1,2).  That a contract did

not exist is supported by the testimony of CNA's vice president of marketing, who

stated that it was never CNA's intent to a contract with Small, but only to advise

Small that Core was a potential replacement for CNA's PEO services.  (Doc. 84 at

179-81).  Because there is no evidence that CNA entered into a contract with Small

for further PEO services, judgment will be entered in favor of CNA and against

Small on the breach of contract claim.

---

[2] To the extent that Small contends that CNA breached its obligation to
provide ninety days notice of the discontinuation of PEO services, the contract
submitted into evidence was not executed by CNA and, in any event, by its terms
requires such notice only upon termination of Small as an agent for CNA—not
upon discontinuation of one of CNA's services.  (<u>See</u> Trial Ex. 4; Doc. 84 at 185).

With regard to Core, however, the court finds that it entered into a bilateral contract with Small.[3]  The terms of the agreement were sufficiently delineated in the correspondence from Core to Small:  Core was to provide payroll processing and billing services at CNA rates and with "all current terms and conditions"; Core was to provide health coverage for the clients with "no break in coverage"; Small was to receive twenty-five dollars for each PEO employee that he converted to Core who stayed with Core through June 2002; and Small was to receive the same commissions with Core that he had received with CNA.  (Trial Ex. 3, 5).  The correspondence instructed Small to have his clients sign a Core subscriber agreement and explain that the "terms and conditions will remain the same [as they are with CNA] except for benefit providers."  (Trial Ex. 3, 5).  Further, the subscriber agreement itself provided that "[a]ll terms and conditions of the existing CNA . . . Client Services Agreement between client and [CNA] including administration fees, State Unemployment Rates, FICA, and Workers' Compensation Rates remain as agreed in that Client Services Agreement."  (Trial Ex. 5).

---

[3]  See First Home Sav. Bank, FSB v. Nernberg, 648 A.2d 9, 14 (Pa. Super. Ct. 1994) ("Bilateral contracts involve two promises and are created when one party promises to do or forbear from doing something in exchange for a promise from the other party to do or forbear from doing something else.").

The terms of the agreement—including the then-indefinite terms of the workers' compensation services[4]—were reiterated and acknowledged by Rawles, the President of Core, at the February 21, 2002, meeting with Small and Kohl, and Rawles explicitly stated that the accounts were reviewed and acceptable to Core and that there would be no problem servicing them.  (Trial Exs. 3, 5).  Rawles, on behalf of Core, offered to pay Small and service his CNA accounts if Small would agree to provide his clients to Core.[5]  Small expressly accepted these terms,and performed his end of the agreement by having his clients complete and submit to Core subscriber agreements, the majority of which were received by Core the first week of March 2002.[6]  All were in Core's possession by March 23, 2002.  Core was obligated to service Small's accounts, but breached its obligation to Small when it informed him that it would not be able to provide the services for *any* of his clients.[7]

---

[4]  (See Trial Exs. 3, 5) (providing that workers' compensation services would be placed with a carrier that had "agreed to accept the vast majority" of PEO accounts "as is").

[5]  See GMH Assoc., Inc. v. Prudential Realty Group, 752 A.2d 889, 899 (Pa. Super. Ct. 2000) ("The first essential of any contract is the existence of a promise or an offer to enter into a contract.").

[6]  See Hartman v. Baker, 766 A.2d 347, 351 (Pa. Super. Ct. 2000) ("[A] contract is created where there is mutual assent to the terms of a[n] [agreement] by the parties with the capacity to contract."); see also In re Ratony's Estate, 277 A.2d 791, 792-93 (Pa. 1971) ("[M]utual promises are binding upon the parties thereto and furnish valid consideration."); see also RESTATEMENT (FIRST) CONTRACTS § 75 ("Consideration for a promise is . . . a return promise, bargained for and given in exchange for the promise . . . .").

[7]  See Widmer Eng'g, Inc. v. Dufalla, 837 A.2d 459, 467 (Pa. Super. Ct. 2003) ("When performance of a duty under a contract is due, any nonperformance is a breach.") (quoting RESTATEMENT (SECOND) CONTRACTS § 235(2) (1981)).

This breach—on the last days of CNA coverage—left Small scrambling for alternative services, and caused Small to lose all of his PEO business.

The court concludes, by a preponderance of the evidence, that Core entered into and breached an agreement with Small for PEO services.  Therefore, the court will enter judgment in favor of Small and against Core on the breach of contract claim.

### B.    Detrimental Reliance

Under Pennsylvania law, a claim of detrimental reliance is a promissory estoppel cause of action.  See Rinehimer v. Luzerne County Cmty. Coll., 539 A.2d 1298, 1306 (Pa. Super. Ct. 1988); Thermacon Enviro Sys., Inc. v. GMH Assoc. of Am., Inc., 2001 WL 1807890, at *2 (Pa. Com. Pls. 2001).[8]  Promissory estoppel allows a party to enforce contract-like promises made unenforceable as a breach of contract claim by technical defects or defenses.  See Crouse v. Cyclops Indus., 745 A.2d 606, 610 (Pa. 2000); Thompson v. Schriver, 2002 WL 31661603 (Pa. Com. Pls. 2002); see also MDNet, Inc. v. Pharmacia Corp., 2005 WL 1385906, at *4 (3d Cir 2005).

Pennsylvania has adopted section 90 of the Restatement (Second) of Contracts for promissory estoppel.  See Murphy v. Burke, 311 A.2d 904, 908 (Pa. 1973); Travers v. Cameron County Sch. Dist., 544 A.2d 547, 550 (Pa. Cmmw. Ct. 1988).

---

[8] Promissory estoppel is an outgrowth of equitable estoppel but, unlike equitable estoppel, it may serve as an independent cause of action.  See Paul v. Lankenau Hosp., 543 A.2d 1148, 1152-53 (Pa. Super. Ct. 1988), rev'd on other grounds, 569 A.2d 346 (Pa. 1990); Travers v. Cameron County Sch. Dist., 544 A.2d 547, 612-13 (Pa. Cmmw. Ct. 1988).

This section provides that a promise, which the promisor should reasonably expect to include action or forebearance of a definite and substantial character on the part of the promisee, and which does induce such action or forebearance, is binding if injustice can be avoided only by the enforcement of the promise.  Crouse, 745 A.2d at 610; Thatcher's Drug Store of W. Goshen, Inc. v. Consol. Supermarkets, Inc., 636 A.2d 156, 160 (Pa. 1994); Weavertown, 834 A.2d at 1174; Restatement (SECOND) OF CONTRACTS § 90 (1981).

In the matter *sub judice*, Small has failed to make out a *prima facia* case of promissory estoppel against CNA.  Representatives from CNA never made promises directly to Small upon which he detrimentally relied.  (Doc. 84 at 181). Although **Core** made express representations to Small, **CNA** did not promise Small that any transition of his PEO accounts to Core would be "seamless," tell Small that he must transition his accounts to Core, or ask Small to refrain from going to another PEO provider such as H.R. Logic.  (Doc. 84 at 178-81).  Further, although Small contends that CNA "recommended" Core as an alternative provider, a mere recommendation is insufficient to support a finding of promissory estoppel.  See Weavertown, 834 A.2d at 1174 (stating that promissory estoppel cannot be "loosely" applied).  As such, judgment will be entered in favor of CNA and against Small on the promissory estoppel claim.[9]

---

[9]  Small also contends that CNA would have benefitted from Small's transition of his PEO accounts to Core.  However, it is clear that CNA was simply an incidental beneficiary to the agreement between Small and Core and, as such, is not liable to Small for Core's breach.  See Weavertown, 834 A.2d at 1172-73.

With regard to Core, the court notes that, under Pennsylvania law, promissory estoppel is inapplicable when the facts of a given case are sufficient to support a claim for breach of contract.  See Lobar, Inc. v. Lycoming Masonry, Inc., 876 A.2d 997, 1000 (Pa. Super. Ct. 2005) (holding that promissory estoppel is inapplicable where "liability can be decided properly and finally on contractual principles of offer and acceptance") (quoting Hedden v. Lupinsky, 176 A.2d 406, 408 (Pa. 1962).  In light of the court's ruling in favor of Small in its breach of contract claim against Core, further analysis is unnecessary.

### C.    Damages

In a breach of contract or promissory estoppel action, damages are awarded to compensate the injured party for losses incurred because of the breach.  Empire Prop., Inc. v. Equireal, Inc., 674 A.2d 297, 304 (Pa. 1996); cf. Green v. Interstate United Mgmt. Serv. Corp., 748 F.2d 827, 830-31 (3d Cir. 1984) (stating that the remedy for breach in promissory estoppel case is limited only "as justice requires"); RESTATEMENT (SECOND) OF CONTRACTS § 90(1) (1981) (same).  The purpose of damages is to put the plaintiff in the position he or she would have been but for the breach.  Pittsburgh Constr. Co. v. Griffith, 834 A.2d 572, 580 (Pa. Super. Ct. 2003). "Recovery will not be precluded simply because there is some uncertainty as to the precise amount of damages incurred," however, a plaintiff must still put forth "evidence which establishes, with a fair degree of probability, a basis for their assessment."  Wujik v. Yorktowne Dental Assoc., Inc., 701 A.2d 581, 584 (Pa. Super. Ct. 1997) (citation omitted).

For a loss of profits claim, the amount of loss must be established with reasonable certainty and the evidence must reflect that the loss was reasonably foreseeable and a proximate consequence of the wrong.  <u>Advent Sys. Ltd. v. Unisys Corp.</u>, 925 F.2d 670, 680 (3d Cir. 2001);<u>Wilcox v. Regester</u>, 207 A.2d 817, 822 (Pa. 1965); <u>Hahn v. Andrews</u>, 126 A.2d 519, 521 (Pa. Super. Ct. 1956); <u>Dep't of Transp. v. Brozetti</u>, 684 A.2d 658, 666 n.16 (Pa. Commw. Ct. 1996).  For an established business, loss of profits may be proven by evidence of  (1) past profits, (2) profits made by others or by similar contracts, or (3) expert testimony that is based upon more than individual opinion or conjecture.  <u>Advent</u>, 925 F.2d at 681.

In the case *sub judice*, Small introduced credible expert testimony regarding damages arising from Core's breach of the agreement.  With regard to loss of PEO commissions, the court finds that the losses proffered are supported by historical evidence of Small's commissions.  However, the relief requested will be limited to a three year period.  The court accepts expert witnesses testimony that, under generally accepted accounting principles, the standard period for a loss of profits analysis is three years.  However, the court finds that the suggestion for an enlargement of this period—that the insurance industry uses a seven year time frame as a "rule of thumb"—is based upon conjecture.  Indeed, the expert witness failed to articulate any reasonable explanation for such an enlargement.  Accordingly, the loss of PEO commissions will be calculated for a three year period, from 2003 through 2005, and will take into account the overlapping commissions Small receives for the placement of workers' compensation services for former PEO

clients.  This results in a net loss of PEO commissions of $146,418.00.  (See Trial Ex. 7; Doc. 84 at 87, 92, 110-11); see also Cooke v. Equitable Life Assur. Soc. of U.S., 732 A.2d 723, 729 (Pa. Super. Ct. 1999).

With respect to the loss of compensation for the transition of clients from CNA to Core, the court again finds that Small's proffered expert testimony was credible, and that the evidence clearly establishes that Small would have been entitled to $11,050.00 for transitioning his CNA PEO clients to Core.  As set forth in Core's February 14 correspondence, this amount is derived by multiplying twenty-five dollars by the number of employees that would have been transitioned to Core but for its breach.

As for Small's claim of loss of premiums from future sales to a captive audience, the court finds that these damages are too speculative for an award. Although the contract would have arguably given Small a captive audience to solicit non-PEO business, the nature and extent of any additional services cannot be readily or reasonably determined from the evidence of record.  Accordingly, the court will deny an award of damages for any such losses.

### III.   Conclusions of Law

1.   Plaintiff has failed to prove by a preponderance of the evidence the elements necessary under Pennsylvania law to succeed on a claim for breach of contract against CNA.

2.      Plaintiff has failed to prove by a preponderance of the evidence the elements necessary under Pennsylvania law to succeed on a claim for detrimental reliance against CNA.

3.      Plaintiff has proven by a preponderance of the evidence the elements necessary under Pennsylvania law to succeed on a claim for breach of contract against Core.

4.      Judgment should be entered against Small and for CNA on the claims of breach of contract and detrimental reliance claims.

5.      Judgment should be entered against Core and in favor of Small on the claim of breach of contract.

6.      Small has proven damages by a preponderance of the evidence in the amount of $157,468.00 attributable to Core's breach of contract.

7.      The claims of Small for detrimental reliance against Core are moot.

An appropriate order will issue.


　　S/ Christopher C. Conner
　　CHRISTOPHER C. CONNER
　　United States District Judge

Date:        October 26, 2005

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DONALD L. SMALL and SMALL & SMALL, INC.,** | : | **CIVIL ACTION NO. 3:02-CV-1089** |
| | : | |
| | : | **(Judge Conner)** |
| **Plaintiffs** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **CORE EMPLOYER SERVICES, INC. and CNA UNISOURCE,** | : | |
| | : | |
| **Defendants** | : | |

## ORDER

AND NOW, this 26th day of October, 2005, upon consideration of the

complaint (Doc. 1), and following a bench trial, and for the reasons set forth in the

accompanying memorandum, it is hereby ORDERED that:

1.    The Clerk of Court is directed to enter JUDGMENT:

    a.    In favor of plaintiffs Donald L. Small and Small & Small, Inc., and against defendant Core Employee Services, Inc. in the amount of $157,468.00.

    b.    In favor of defendant CNA Unisource and against plaintiffs Donald L. Small and Small & Small, Inc.

2.    The claims of plaintiffs Donald L. Small and Small & Small, Inc., against Core Employee Services, Inc., for detrimental reliance are DISMISSED as moot.

3.    The Clerk of Court is directed to CLOSE this case.

                               S/ Christopher C. Conner
                                CHRISTOPHER C. CONNER
                                United States District Judge